UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| BENJAMIN H. STEINBERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:19-cv-00081-JRS-DLP |
| | ) | |
| RICHARD BROWN, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting Motions for Summary Judgment
and Directing Entry of Final Judgment**

Plaintiff Benjamin Steinberg, an inmate of the Indiana Department of Correction

("IDOC"), brings his lawsuit pursuant to 42 U.S.C. § 1983 alleging that he was retaliated against

and has received constitutionally inadequate medical care when he was confined at the Wabash

Valley Correctional Facility ("WVCF"). He sues Richard Brown and Kevin Gilmore (the "State

Defendants") and Jackie West-Denning, Kimberly Hobson, Alicia Huff, and Barbara Riggs (the

"Medical Defendants"). The defendants move for summary judgment. Mr. Steinberg has

responded, and the defendants have replied. For the foregoing reasons, the motions for summary

judgment are granted.

**I. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or

genuinely disputed, the party must support the asserted fact by citing to particular parts of the

record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can

also support a fact by showing that the materials cited do not establish the absence or presence of

a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 572-73 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II. Facts

The following statement of facts was evaluated pursuant to the standards set forth above. That is, the statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and disputed evidence are presented in the light reasonably most favorable to Mr. Steinberg as the non-moving party. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

A. *The Parties*

Mr. Steinberg was incarcerated at WVCF from approximately April 2017 through December 2019. Dkt. 120-5 p. 3 (Deposition of Benjamin Steinberg ("Steinberg Dep.") at 7:16-8:2).

Jackie West-Denning is a physician licensed to practice medicine in the State of Indiana. She was formerly employed by Wexford of Indiana, LLC as a physician at the WVCF. Dkt. 120-1 ¶ 1-2.

Alecia Huff is a nurse licensed in the State of Indiana. Dkt. 120-2 ¶ 1. During all times relevant to the current cause of action, she was employed by Wexford of Indiana, LLC as nurse at WVCF. *Id.* ¶ 2.

Barbara Riggs is a nurse licensed in the State of Indiana. Dkt. 120-3 ¶ 1. During all times relevant to the current cause of action, she was employed by Wexford of Indiana, LLC as the nurse at WVCF. *Id.* ¶ 2. As a nurse at WVCF, Ms. Riggs has several job duties and responsibilities. *Id.* ¶ 4. One of her primary responsibilities includes the review, at times, of written healthcare request slips submitted by inmates, as well as performing initial assessments. *Id.*

Kim Hobson is a nurse licensed in the State of Indiana. Dkt. 120-4 ¶ 1. During all times relevant to this case, she was employed by Wexford as the Health Services Administrator ("HSA")

at WVCF. *Id.* ¶ 2. As the HSA, Ms. Hobson's duties and responsibilities are primarily administrative in nature, as she is rarely involved in direct patient care. *Id.* ¶ 3. Instead, Ms. Hobson supervises the provision of medical services at the facility, ensures compliance with IDOC healthcare directives, and, among other things reviews grievances that inmates submit regarding medical care. *Id.*

B. *Mr. Steinberg's Medical Care*

Before Dr. Denning's time treating Mr. Steinberg, his medical care had been primarily handled by Dr. Samuel Byrd, another physician at the facility. Dkt. 120-1 ¶ 4. Mr. Steinberg had a medical history of recurrent neck pain for about the last several years, among other things. *Id.*

Dr. Denning had initial evaluations with Mr. Steinberg on January 2, 2018, February 13, 2018, and March 6, 2018, all involving Mr. Steinberg's complaints of ongoing neck pain, for which he was prescribed medications, as well as instructions regarding a home exercise plan. *Id.* ¶ 5; dkt. 120-6 p. 35-37, 31-34, 27-30. Despite Mr. Steinberg's complaints to Dr. Denning that he was having recurrent neck pain, she was later notified that he was a member of the facility volleyball team and was consistently engaging in vigorous athletic activity. Dkt. 120-1 ¶ 6.

Dr. Denning examined Mr. Steinberg again on April 25, 2018. Dkt. 120-1 ¶ 7; dkt. 120-2, p. 22-24. He continued to complain of ongoing neck discomfort as well as pain in the low back. *Id.* Dr. Denning discussed with Mr. Steinberg not only his ongoing complaints of neck pain but also his complaints of low back pain and nocturia, and his belief that he had been diagnosed with fibromyalgia. *Id.* In light of his ongoing complaints, she ordered x-rays and a number of labs. *Id.* At that time, Mr. Steinberg had prescriptions of Acyclovir, Simethicone, Mobic, and Wellbutrin. *Id.* Mr. Steinberg testifies that around this time, Dr. Denning told him that he might have an

infection in his left hand. Dkt. 120-5 p. 9 (Steinberg Dep. at 32:4-33:2). Mr. Steinberg did not believe he needed antibiotics and signed a refusal form. *Id.*

On May 17, 2018, Ms. Riggs saw Mr. Steinberg for an initial assessment and discussion after he submitted a healthcare request, in which he requested the results of a prior x-ray, as well as to discuss his pain medications. Dkt. 120-3 ¶ 5; dkt. 120-6 p. 20-21. Ms. Riggs informed Mr. Steinberg that the results of his x-rays were all within the normal limits, and that he needed to give his current prescribed medications time to work. *Id.* Ms. Riggs's notes do not indicate that Mr. Steinberg complained of, or presented with, any signs or symptoms consistent with an infection on his hand. Dkt. 120-3 ¶ 6; dkt. 120-6 p. 20-21.

Dr. Denning followed up with Mr. Steinberg on May 22, 2018. He again complained of ongoing neck and back pain, as well as some gastrointestinal complaints. Dkt. 120-1 ¶ 8; dkt. 120-6 p. 16-19. Dr. Denning's examination of his extremities was normal during this visit, but she changed his medication for his neck pain in an attempt to provide him with increased relief for his discomfort. *Id.* While not specifically mentioned in Dr. Denning's notes, she states that she does recall that Mr. Steinberg was previously offered an antibiotic as a preventative measure due to some redness around a recent piercing. Dkt. 120-1 ¶ 9. Dr. Denning testifies that Mr. Steinberg did not have an active infection, and that if he did, she would have noted it in the medical records. *Id.*

On May 26, 2018, nurse Chantell Knepp evaluated Mr. Steinberg on nurse sick call for his complaint of a fungal infection of his groin. Dkt. 120-3 ¶ 7; dkt. 120-6 p. 14-15. Nurse Knepp did not note any signs of or evidence of any infection. *Id.* Nurse Knepp did not note any signs or symptoms consistent with an infection on his hand. *Id.*

On May 31, 2018, Mr. Steinberg submitted a request for health care stating that the area on his hand around the piercing was red and had a pus-filled blister on top of it. Dkt. 115-2.

5

Nurse Huff saw Mr. Steinberg during nurse sick call on June 2, 2018. Dkt. 120-2 ¶ 4; dkt. 120-6 p. 11-13. Ms. Huff physically assessed the hand, and asked Mr. Steinberg about his medical history. Dkt. 120-2 ¶ 5; dkt. 120-6 p. 11-13. He reported that he pierced his own left hand and he also reported that Dr. Denning had seen him a few weeks prior regarding this infection. *Id.* Ms. Huff did not observe any signs or symptoms consistent with an infection. *Id.* She did not observe any warmth, redness, or discharge, which would be expected if an infection were present. *Id.* Ms. Huff did note the area where he had pierced his hand and noted in her assessment that there was an "alteration in skin integrity." *Id.* To ensure that she was not missing something, she brought in another nurse to also look at his hand, who agreed that there were no signs of an active infection. *Id.* At this, Ms. Huff testifies that Mr. Steinberg became increasingly argumentative and combative. *Id.* Mr. Steinberg was asked to leave because he would not allow Ms. Huff to discuss her findings with him. *Id.* If Ms. Huff had observed any signs or symptoms consistent with an infection, she would have either submitted Mr. Steinberg for an assessment by a physician onsite or would have simply received verbal orders to initiate medication. Dkt. 120-2 ¶ 7.

Mr. Steinberg submitted a second request for healthcare on June 2, 2018, again stating that he believed his hand was infected. Dkt. 115-3.

Ms. Riggs saw Mr. Steinberg on June 4, 2018. Dkt. 120-3 ¶ 9; dkt. 120-6 p. 8-10. Mr. Steinberg expressed he wanted to see the doctor because he believed his hand was infected. *Id.* Ms. Riggs assessed his hand and did not note any sign of infection. *Id.* There was no redness, no discharge, warmth, discoloration, or other sign or symptom consistent with an ongoing infectious disease process. *Id.* She therefore did not believe he required a referral to the doctor. *Id.* But Ms. Riggs advised Mr. Steinberg that she would notify the doctor of his concerns. *Id.* Ms. Riggs does not recall if she sent an e-mail to Dr. Jackie West-Denning or Dr. Byrd or stopped

by one of their offices, but states that she would have notified a physician in accordance with her notes. Dkt. 120-3 ¶ 9.

Ms. Riggs again saw Mr. Steinberg on June 29, 2018, after he submitted a health care request slip. *Id.* ¶ 10; dkt. 120-6 p. 6-7. At this visit, Mr. Steinberg did not complain of any ongoing infection in his hand, but instead complained of muscle fatigue, tingling and numbness of both arms. *Id.* Ms. Riggs notified the physician of Mr. Steinberg's complaints, which resulted in his assessment by Dr. Denning a few days later. *Id.*

Mr. Steinberg testifies that later that week, he saw Dr. Denning in the hall and asked her to look at his hand. Dkt. 129 p. 25-26 ¶ 16. He states that she responded: "It's a bad time for you to need favors from me, isn't it?" *Id.*[1]

Dr. Denning saw Mr. Steinberg again on July 5, 2018. Dkt. 120-1 ¶ 10; dkt. 120-6 p. 2-5. At that appointment, he did not report or present with any significant abnormality or infection of his hand but wished to discuss his current prescription of pain medication for his ongoing neck and back pain. *Id.* Mr. Steinberg also complained of some abdominal discomfort. *Id.* Dr. Denning made some changes to his pain medication regimen and advised him to continue performing his home exercise plan as tolerated. *Id.* Dr. Denning did not observe or note the existence of an infection or significant abnormality of the hand, despite performing a rather thorough physical examination as noted in the record. *Id.* Mr. Steinberg states that the piercing had fallen out by this time.

---

[1] Mr. Steinberg also presents the affidavit of another inmate who states he overheard this conversation. The other inmate states that Dr. Denning stated: "After lying about me in that statement for Kenny?... It's a bad time for you to be asking me for favors." Dkt. 129 p. 21 ¶ 6. The defendants object to this affidavit because Mr. Steinberg did not previously identify this other inmate as a witness. But because this testimony is cumulative of Mr. Steinberg's testimony regarding this conversation, it is not necessary at summary judgment to determine whether it is admissible.

Shortly thereafter Dr. Denning left her employment with Wexford of Indiana, LLC, and did not have any further involvement in Mr. Steinberg's medical care. Dkt. 120-1 ¶ 11.

At some point in July 2018, WVCF grievance staff contacted Ms. Hobson regarding a formal grievance that Mr. Steinberg had submitted regarding the treatment he was receiving for his hand. Dkt. 120-4 ¶ 4. Mr. Steinberg asserted in his grievance that he had been denied treatment for an infection on his hand. *Id.* Ms. Hobson reviewed the relevant medical records and an informal grievance response submitted by Director of Nursing Amy Wright. *Id.* The medical records revealed Dr. Denning had assessed Mr. Steinberg on two separate occasions and he had been seen on nursing sick call on June 2, 2018 and June 4, 2018, with no indication of any signs or symptoms consistent with an infection. *Id.*; dkt. 2-1 p. 102. Based upon her review of the informal grievance response and the medical records, Ms. Hobson concluded that Ms. Wright's informal grievance response was appropriate, and that if Mr. Steinberg had any medical concerns, he could submit a written health care request form. *Id.*

After the piercing fell out, Mr. Steinberg testified that his hand "actually…healed fairly decent." *Id.* p. 14 (Steinberg Dep. at 52:21).

B. *Mr. Steinberg's Porter Assignment*

In early June 2018, Mr. Steinberg submitted an affidavit in support of a lawsuit that his cellmate Kenneth Wolfe had filed against Dr. Denning. *See* dkt. 120-5 p. 7 (Steinberg Dep. at 22:21-23:1). Also in June 2018, after Mr. Steinberg had submitted multiple health care requests complaining of ongoing neck and low back discomfort, Dr. Denning asserts that correctional staff contacted her regarding Mr. Steinberg's assignment as a porter for Mr. Wolfe. Dkt. 120-1 ¶ 15. Mr. Steinberg contends that, to the contrary, Dr. Denning reached out to correctional staff. In support, he cites emails between medical and correctional staff. Dkt. 129 p. 14-18. These emails

include an email from Amy Wright stating that Dr. Denning would like Mr. Steinberg moved from Mr. Wolfe's cell because she is not sure how Mr. Steinberg can take care of him with his ailments. *Id.* At this time, Dr. Denning was also treating Mr. Wolfe. Dkt. 120-1 ¶ 15.

Dr. Denning decided that it was not in either Mr. Steinberg or Mr. Wolfe's best interest that Mr. Steinberg remain assigned as Mr. Wolfe's porter. *Id.* ¶ 16. Mr. Steinberg had been complaining of ongoing and increased discomfort during this time period. *Id.* When asked about her recommendation, Dr. Denning emailed prison staff stating: "Mr. Steinburg [sic] wants to have it both ways – have a job and say he has all these medical issues. Mr. Wolfe does not need a porter, medically. Someone else does. Mr. Steinburg [sic] is trained to be a porter. He can go where he is needed, just as we all do." Dkt. 129 p. 16. With respect to her opinion that Mr. Wolfe did not need a porter, she stated by email:

> What are the parameters to qualify for a porter?
> Mr. Wolfe does not have dementia, he has adequate use of his limbs (upper and lower) although he does use a cane for ambulating long distances. I do not understand why he would need a porter. There is not a medical reason for it (his need for the wheelchair was litigated in federal court, and he was found not to need one, as concurs with medical judgment on site). Mr. Wolfe appears to be able to perform his ADL's[2] based on my multiple evaluations of him. Happy to re-evaluate him, if needed. Last visit was 3/20/18.
> If there is some other reason for a porter, sure, go for it!

Dkt. 129 p. 16.

Dr. Denning testifies that her opinions regarding these assignments were not based upon ongoing litigation. Dkt. 120-7 ¶ 17. At that time, she was aware that Mr. Wolfe had filed a lawsuit, but she testifies that she was not aware that Mr. Steinberg was involved in that lawsuit. *Id.* The lawsuit was being handled by an attorney, but she was not notified on a daily or even weekly basis regarding the status of the lawsuit and recent filings. *Id.*

---

[2] "ADL's" refers to "activities of daily living."

9

Dr. Denning testifies that her recommendation regarding Mr. Steinberg's assignment as Mr. Wolfe's porter was based on two separate factors. *Id.* ¶ 18. First, her evaluations of Mr. Steinberg at that time had been inconsistent. *Id.* Mr. Steinberg had repeatedly complained of significant neck and back pain and alleged that this back pain limited his ability to perform his own activities of daily living at times. *Id.* However, he later expressed to Dr. Denning that he engaged in rather strenuous physical activity, regularly played volleyball and other sports, and was also a porter for Mr. Wolfe. *Id.* In addition, as discussed above, Dr. Denning also did not believe that Mr. Wolfe required a porter at that time. *Id*. Dr. Denning was not aware of the extent to which Mr. Steinberg was assisting Mr. Wolfe on a daily basis, but given Mr. Steinberg's ongoing complaints of discomfort, it did not appear to her, from a medical standpoint, that his activities as a porter for Mr. Wolfe were helping or improving his discomfort. *Id.* ¶ 19. Dr. Denning's understanding is that porters will perform regular tasks for the individual for which they are assigned. *Id.* ¶ 20. This may be as simple as retrieving trays or helping to carry laundry. *Id.* It may also include moving heavy boxes, pushing patients with wheelchairs throughout the facility, or performing other tasks as needed for the patient. *Id*.

As a physician at WVCF, Dr. Denning did not have the authority to fire an inmate from his job as a porter. *Id.* ¶ 22. Moreover, she did not have the authority to order that specific inmates be assigned to each other as a porter. *Id.* Instead, Dr. Denning could only provide her recommendations and medical justification when asked. *Id.*

Dr. Denning testifies that her recommendation and medical opinions would have been the same in June 2018 had she been immediately notified of Mr. Steinberg's involvement in Mr. Wolfe's litigation. Dkt. 120-1 ¶ 26.

10

### III. Discussion

The Medical Defendants and the State Defendants seek summary judgment on Mr. Steinberg's deliberate indifference claims. In addition, Dr. Denning seeks summary judgment on Mr. Steinberg's retaliation claims against her.

A. *Deliberate Indifference*

Mr. Steinberg claims that the defendants were deliberately indifferent to his serious medical need for treatment for his infected hand.

At all times relevant to Mr. Steinberg's claims, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

"To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an

11

objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). "[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). *See Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* The treatment each defendant provided to Mr. Steinberg will be discussed below.

### 1. Kim Hobson

First, Ms. Hobson argues that she was not deliberately indifferent to Mr. Steinberg's need for treatment. Ms. Hobson was contacted by WVCF grievance staff in July 2018 about a formal

grievance that Mr. Steinberg had submitted regarding the treatment he was receiving for his hand. Dkt. 120-4 ¶ 4. Ms. Hobson's review of Mr. Steinberg's medical records revealed that he had been seen by Dr. Denning and nursing staff several times and that no one who had seen him had concluded that he had signs or symptoms of an infection. *Id.* Ms. Hobson responded that if Mr. Steinberg believed that he needed additional treatment, he should submit a health care request form.

Mr. Steinberg has failed to present evidence from which a reasonable jury could conclude that Ms. Hobson was deliberately indifferent to his serious medical needs. When Mr. Steinberg filed his formal grievance, he had been assessed by medical professionals. Under these circumstances, there is no evidence that Ms. Hobson either knew about a substantial risk to Mr. Steinberg or disregarded it. *Farmer*, 511 U.S. at 837. Ms. Hobson is therefore entitled to summary judgment on Mr. Steinberg's claims.

### 2. Alecia Huff

Next, Ms. Huff argues that she was not deliberately indifferent to Mr. Steinberg's serious medical needs. Ms. Huff assessed Mr. Steinberg's hand during nursing sick call on June 2, 2018. Dkt. 120-2 ¶¶ 4, 5; dkt. 120-6 p. 11-13. She did not observe any symptoms consistent with infection such as warmth, redness, or discharge. *Id.* She had another nurse look at his hand, who agreed that there were no signs of infection. *Id.*

No reasonable jury could conclude, based on these facts, that Ms. Huff was deliberately indifferent to Mr. Steinberg's serious medical needs. She assessed his hand and did not observe any signs of an active infection and had another nurse provide a second opinion. There is thus no evidence that Ms. Huff knew about a serious risk to Mr. Steinberg and disregarded it. *Farmer*, 511 U.S. at 837. She is therefore entitled to summary judgment on his claims.

### 3. Barbara Riggs

Ms. Riggs first saw Mr. Steinberg on May 17, 2018. Dkt. 120-3 ¶ 5; dkt. 120-6 p. 20-21.

Ms. Riggs's notes do not indicate that Mr. Steinberg complained of, or presented with, any signs

or symptoms consistent with an infection on his hand. Dkt. 120-3 ¶ 6; dkt. 120-6 p. 20-21. She

next saw Mr. Steinberg on June 4, 2018, and he then stated that he believed his hand was infected.

Dkt. 120-3 ¶ 9; dkt. 120-6 p. 8-10. Ms. Riggs assessed his hand and did not observe redness,

discharge, warmth, discoloration or any other symptoms consistent with an infection. *Id.* Ms. Riggs

therefore concluded that he did not require referral to a doctor. *Id.* Ms. Riggs again saw

Mr. Steinberg on June 29, 2018, after he submitted a health care request slip. Dkt. 120-3 ¶ 10;

dkt. 120-6 p. 6-7. At this visit, Mr. Steinberg did not complain of any ongoing infection in his

hand, but instead complained of muscle fatigue, tingling and numbness of both arms. *Id.* Ms. Riggs

notified the physician of Mr. Steinberg's complaints, which resulted in his assessment by

Dr. Denning a few days later. *Id.*

In short, when she saw Mr. Steinberg, Ms. Riggs assessed his complaints and concluded

that his hand was not infected. Based on these facts, no reasonable jury could conclude that

Ms. Riggs was deliberately indifferent to Mr. Steinberg's serious medical needs. She is therefore

entitled to summary judgment.

### 4. Jackie West-Denning

Dr. Denning saw Mr. Steinberg on multiple occasions in 2018 and 2019. Mr. Steinberg

testifies that when he saw her in April of 2018, she told him that he might have an infection in his

left hand. Dkt. 120-5 p. 9 (Steinberg Dep. at 32:4-33:2). Mr. Steinberg did not believe he needed

antibiotics and signed a refusal form. *Id.* When Dr. Denning saw Mr. Steinberg on May 22, 2018,

he complained of neck and back pain, but there is no indication in her notes of hand pain or

14

infection of the hand. Dkt. 120-1 ¶ 8; dkt. 120-6 p. 16-19. Dr. Denning saw Mr. Steinberg again

on July 5, 2018. Dkt. 120-1 ¶ 10; dkt. 120-6 p. 2-5. At that appointment, he did not report or present

with any significant abnormality or infection of his hand but wished to discuss his current

prescription of pain medication for his ongoing neck and back pain. *Id.* Dr. Denning did not

observe or note the existence of an infection or significant abnormality of the hand, despite

performing a rather thorough physical examination as noted in the record. *Id.*

In short, when Dr. Denning first observed Mr. Steinberg's hand, she offered him antibiotics,

but he refused them. When she saw him for treatment over the next few months, he sometimes

complained about his hand and other times he did not. When she did assess his hand, she exercised

her medical judgment and concluded that he did not have an infection. No reasonable jury could

conclude based on these facts that Dr. Denning was deliberately indifferent to Mr. Steinberg's need

for treatment and Dr. Denning is therefore entitled to summary judgment.

### 5. Mr. Brown and Mr. Gilmore

The claim allowed to proceed against defendants Mr. Brown and Mr. Gilmore was the

claim that they were deliberately indifferent to Mr. Steinberg's need for treatment for his hand.

Dkt. 20. Mr. Brown and Mr. Gilmore seek summary judgment on this claim. In response,

Mr. Steinberg states that he did not intend to state a deliberate indifference claim against them.

Dkt. 129 p. 6-7. Defendants Mr. Brown and Mr. Gilmore are therefore entitled to summary

judgment on this claim.

B. *Retaliation*

Mr. Steinberg claims that Dr. Denning retaliated against him by recommending that he should no longer be assigned to be Mr. Wolfe's porter.[3] He also asserts that she denied him treatment for his hand out of retaliation.

To prevail on his First Amendment retaliation claim, Mr. Steinberg must show that "(1) []he engaged in activity protected by the First Amendment; (2) []he suffered a deprivation that would likely deter First Amendment activity; and (3) the protected activity []he engaged in was at least a motivating factor for the retaliatory action." *Archer v. Chisholm*, 870 F.3d 603, 618 (7th Cir. 2017) (internal citations omitted). Dr. Denning does not dispute that Mr. Steinberg engaged in protected First Amendment activity, and she does not appear to dispute that the loss of his assignment as Mr. Wolfe's porter was a deprivation likely to deter future First Amendment activity. Dr. Denning argues, however, that there is no evidence that she was motivated by retaliatory animus in making her recommendation.

To show that Dr. Denning's actions were retaliatory, Mr. Steinberg must provide evidence that retaliatory animus was at least a "motivating factor" in her actions. *Mays v. Springborn*, 719 F.3d 631, 635 (7th Cir. 2013). This "can … be demonstrated by suspicious timing alone only when the . . . action follows on the close heels of protected expressions." *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019). Even if Mr. Steinberg can demonstrate that retaliatory animus was a motivating factor in a defendant's actions, this is not enough to establish retaliation as a matter of law. Instead, "[t]he burden then shifts to the defendant[] to show that [she] would have taken the

---

[3] Mr. Steinberg also suggests that Dr. Denning's recommendation that Mr. Steinberg no longer work as Mr. Wolfe's porter resulted in Mr. Steinberg's transfer to a far less desirable housing unit. But there is no evidence that Dr. Denning had any control over Mr. Steinberg's housing placement or any knowledge regarding where he would be transferred if he were moved away from Mr. Wolfe.

action despite the bad motive." *Mays*, 719 F.3d at 635. In other words, Dr. Denning can rebut Mr. Steinberg's prima facie case of retaliation "by showing that [her] conduct was not a necessary condition of the harm – the harm would have occurred anyway." *Greene v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011). If Dr. Denning can establish a non-retaliatory motive for the allegedly retaliatory action, Mr. Steinberg must "produce evidence upon which a rational finder of fact could infer that these explanations were lies." *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006).

### 1. Porter Recommendation

Here, Mr. Steinberg contends that Dr. Denning recommended that he no longer be Mr. Wolfe's porter the day after he submitted an affidavit in support of Mr. Wolfe's litigation against her. While Dr. Denning contends that she was not aware of Mr. Steinberg's affidavit at that time, there is some evidence that at some point she did know about the affidavit because Mr. Steinberg testifies that Dr. Denning stated to him that he should not be asking for favors. Dkt. 129 p. 25-26 ¶ 16. But Mr. Steinberg states that this conversation took place in July 2018, after Dr. Denning had sent her June 2018 emails recommending that Mr. Steinberg no longer be assigned to be Mr. Wolfe's porter. This is therefore not enough to establish that Dr. Denning knew about the affidavit in June 2018 and acted accordingly. But the timing between Mr. Steinberg's affidavit and Dr. Denning's recommendation may be enough to raise an inference of a retaliatory motive. *Cf. Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir 2009).

Since Mr. Steinberg has raised an inference that Dr. Denning was motivated by retaliatory animus, "[t]he burden then shifts to [Dr. Denning] to show that [she] would have taken the action despite the bad motive." *Mays*, 719 F.3d at 635. Dr. Denning asserts that her recommendations regarding Mr. Steinberg's assignment as Mr. Wolfe's porter was based on her medical assessment. She states that it was her decision that it was not in either Mr. Steinberg or Mr. Wolfe's best interest

that Mr. Steinberg remain assigned as Mr. Wolfe's porter because Mr. Steinberg had been

complaining of ongoing and increased discomfort and because she did not believe that Mr. Wolfe

needed a porter. Dkt. 120-1 ¶ 16. It is undisputed that Mr. Steinberg had regularly complained to

Dr. Denning of neck and back pain. In fact, Mr. Steinberg testified at his deposition:

> I said that some days I'm capable of lifting heavy weights, and some days just
> brushing my teeth – I didn't say I was incapable of lifting my arm. But I said
> sometimes lifting – or even just brushing my teeth, something as simple as that,
> causes fatigue in my arm that's nearly unbearable.

Dkt. 120-5 at 16 (Steinberg Dep. p. 61:9-15). Dr. Denning has therefore shown that she had a non-

retaliatory reason for making her recommendation. Because Mr. Steinberg has failed to show that

this reason was not true and was therefore pretextual, he has failed to present sufficient evidence

to support his retaliation claim against Dr. Denning. Mr. Steinberg argues that Dr. Denning's

actions on this matter are inconsistent because she also stated by email that Mr. Steinberg could

be someone else's porter. Any inconsistency is inconsequential, however, because Dr. Denning has

presented sufficient evidence that her recommendation was based on Mr. Steinberg's complaints

of pain and therefore that she would have made the recommendation anyway despite any

retaliatory motive she might have had. *See Mays*, 719 F.3d at 634. And this nonretaliatory reason

is borne out by Mr. Steinberg's medical records. She is therefore entitled to summary judgment on

Mr. Steinberg's retaliation claim.

### 2. Medical Treatment

Mr. Steinberg also contends that Dr. Denning failed to provide him treatment for his hand

out of spite. He states that he saw her in the hall in early July of 2018 and asked her to look at his

hand. Dkt. 129 p. 25-26 ¶ 16. She told him it was a bad time for him to ask her for a favor. *Id.*

Even if this incident is enough to make a prima facie showing that Dr. Denning had a retaliatory

motive, Dr. Denning has presented sufficient evidence to show that she would have treated

18

Mr. Steinberg the same absent any retaliatory motive. First, this interaction took place during a passing encounter in the hall, not a medical appointment. When Dr. Denning saw Mr. Steinberg in the clinic on July 5, 2018,[4] she performed a thorough exam, made some changes to his pain medication and advised him to continue his home exercise plan. Dkt. 120-1 ¶ 10; dkt. 120-6 p. 2-5. As discussed above, her clinical evaluations were based on her medical judgment. Mr. Steinberg has failed to present evidence that retaliation, and not medical judgment, was the basis of Dr. Denning's treatment decisions at that time. Moreover, Mr. Steinberg himself asserts that his piercing had fallen out at this time. Dkt. 129 p. 4 ¶ 8. Dr. Denning is therefore entitled to summary judgment on any claim that she failed to treat him out of retaliation for his filing of an affidavit in a lawsuit against her.

### IV. Conclusion

For the foregoing reasons, the defendants' motions for summary judgment, dkt. [115], and dkt. [118], are **granted**. Judgment consistent with this Order shall now issue.

**IT IS SO ORDERED.**

Date: 8/24/2020

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

---

[4] It is not clear from Mr. Steinberg's testimony whether this incident took place before or after the July 5, 2018, appointment.

Distribution:

BENJAMIN H. STEINBERG
157690
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All Electronically Registered Counsel